AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| United States of America<br>v.<br>Adam Joiner<br><br>*Defendant(s)* | Case No. 19MJ03283 (crossed out)<br>19MJ03346 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 7, 2016, and August 12, 2016, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1957, and 1028A | Wire Fraud; Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; Aggravated Identity Theft |

This criminal complaint is based on these facts:

Please see Attachment to Complaint and attached affidavit.

☑ Continued on the attached sheet.

/s/
Complainant's signature

Nathan Cherney, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 8/13/19

/s/
Judge's signature

City and state: Los Angeles, California
The Honorable John E. McDermott
Printed name and title

**Attachment to Complaint**

Count One (18 U.S.C. § 1343)

      Beginning on an unknown date, and continuing through at least on or about July 13, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant ADAM JOINER ("JOINER"), knowingly and with the intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, promises, and the concealment of material facts. The scheme to defraud was carried out in substance as follows: Defendant JOINER would solicit financial investments in film projects from potential investors, such as Korea Investment Partners Co., Ltd. and Star Century Pictures Co., Ltd. Through oral statements and written materials, defendant JOINER would represent to the potential investors that established film distributors, such as Netflix and Amblin, had agreed to distribute the film projects he was producing through his company, Dark Planet Pictures, LLC, and for which he sought the financial investments. The representations were false and concealed material facts because, among other things, the film distributors had not agreed to distribute the films. Defendant JOINER would create and distribute to the potential investors fabricated agreements with the film distributors that used the names of real persons. In reliance on defendant JOINER's false representations, the potential investors would transfer funds by wire into a bank account under defendant JOINER's control. On or about April 7, 2016, within the Central District of California, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendant JOINER caused the transmission by means of wire communication in foreign commerce an email to Korea Investment Partners Co., Ltd. attaching a purported distribution agreement between Netflix and Dark Planet Pictures, LLC.

Count Two (18 U.S.C. §§ 1957(a); 2(b))

      On or about August 12, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant ADAM JOINER, knowing that the funds involved represented the proceeds of some form of unlawful activity, knowingly engaged and willfully caused others to engage in a monetary transaction, affecting interstate commerce, in criminally-derived property of a value greater than $10,000, by transferring approximately $5,192,916 from a Bank of America account ending in 0230 to California Investor Escrow, for the purchase of a residence in Manhattan Beach, California, such property, in fact, having been derived from specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1343.

Count Three (18 U.S.C § 1028A)

      On or about April 7, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant ADAM JOINER ("JOINER") knowingly possessed, transferred, and used, without lawful authority, means of identification that defendant JOINER knew belonged to another person, that is, the name and signature of victim T.S., during and in relation to the offense of Wire Fraud, a felony violation of Title 18, United States Code, Section 1343, as charged in Count One of this Complaint.

# AFFIDAVIT

I, Nathan Cherney, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since January 2018. I am currently assigned to a Complex Financial Crime squad of the FBI's Los Angeles Field Office, which is responsible for investigating corporate and securities fraud, including mail fraud, wire fraud, securities fraud, and insider trading.

2.   Since becoming an FBI Special Agent in 2018, I have received approximately 19 weeks of formal training at the FBI Training Academy in Quantico, Virginia, in financial analysis, interviewing, surveillance, and other investigative techniques. In June 2019, I also attended a multi-day Securities Industry Essentials formal training sponsored by the FBI Economics Crimes Unit. At this training, I received formal training essential to securities industry markets, regulatory agencies and their functions, and prohibited practices. Before joining the FBI, I performed numerous financial audits while employed as an auditor at a public accounting firm for approximately three years. I participated in many aspects of the audits including, but not limited to, procedures for fraud detection, financial analysis, and reviews of accounting and bank records. I received approximately eight weeks of formal training from the accounting firm including, but not limited to, fraud, accounting principles, financial analysis, and auditing principles. I hold a Bachelor of Arts degree in Economics from the University of Michigan and a Master of Science in Accounting from Michigan State University. I am currently a Certified Public Accountant in the state of California.

3.   In addition to my formal training and personal experience, I have learned from and worked alongside numerous senior FBI agents with years of experience in various criminal investigations including, but not limited to corporate and securities fraud, mail fraud, wire fraud, securities fraud, and insider trading. Throughout my experiences with these senior agents, I have received guidance, training, and hands on experience in various investigative techniques

including but not limited to, interviewing, surveillance, financial analysis, and other investigative techniques, including with respect to the identification and tracing of illicit proceeds.

## II. PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of a criminal complaint and arrest warrant for ADAM JOINER for wire fraud, engaging in transactions with criminally involved property, and aggravated identity theft, in violation of a violation of 18 U.S.C. §§ 1343, 1957, and 1028A, as well as an application for a search warrant for 441 3rd Street, Manhattan Beach, California 90266 (the "SUBJECT PREMISES"), described in Attachment A, for the items described in Attachment B.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. PREMISES TO BE SEARCHED

6. The SUBJECT PREMISES is the property described in Attachment A, which is incorporated herein by reference.

## IV. ITEMS TO BE SEIZED

7. The items to be seized, which are the evidence, fruits, and instrumentalities of violations of wire fraud, money laundering, and aggravated identity theft, in violation of 18 U.S.C. §§ 1343, 1956, 1957, and 1028A, are set forth in Attachment B, which is incorporated herein by reference.

## V. STATEMENT OF PROBABLE CAUSE

8. My investigation has shown that ADAM JOINER orchestrated a fraud scheme in which he made false representations—and employed forged documents—to convince foreign investment firms to invest millions in a film project dubbed *Legends*. JOINER repeatedly

claimed to have entered distribution agreements with major film distributors, such as Netflix, Inc., and Storyteller Distribution Co., LLC, doing business as Amblin Partners ("Amblin"), and even presented to the investors documents he claimed were executed agreements. In reality, he had entered into no such distribution agreements and had done little to no work in producing a film using the investment funds he was provided. Instead, he spent much of the money on himself, including buying a house in Manhattan Beach for over $5 million.

9. From my review of bank records, I know that there is a bank account ending in -0230 held at Bank of America in Manhattan Beach, California, in the name of "Legends Film Co, LLC" (the "*Legends* Bank Account"), and that JOINER was the sole signatory on the bank account.

### A. Korean Investment Firm Invests Millions Based on JOINER's False Representation

10. Based on my investigation to date and review of publicly available records, Korea Investment Global Contents Fund ("KIGCF") is an investment fund based in South Korea. Its assets are managed by Korean Investment Partners Co., Ltd. ("KIP").

11. I have personally interviewed Paul Huh, who worked as a director with KIP from May 2015 to October 2017, as well as Yosep Jeon, executive director at KIP and formerly Huh's supervisor. KIP, through its attorneys, has also provided me with copies of email correspondence. Based on these interviews and my review of the emails and publicly available records, I know the following:

   a. In late 2015, John Yi, an acquaintance of Paul Huh, introduced him to JOINER, who owned a film production company called Dark Planet Pictures, LLC. JOINER claimed to be seeking investment money to produce a film called *Legends*:[1] an anachronistic mash-up of legendary and historical figures from nineteenth century America, such as Davy Crockett, Calamity Jane, Paul Bunyan, and John Henry. Huh was furnished with a screenplay for *Legends*, written by JOINER's brother, Andrew Joiner. Huh and JOINER communicated by

---

[1] Huh recalled that JOINER informed him in 2017 that the name of *Legends* would be changed to *Folkwar*.

email and telephone and also met in person. Based on their residences and the contents of many of their communications referencing locations, Huh was generally based in South Korea and JOINER in Southern California during the telephone and email communications.

      b.     Eventually, JOINER informed Huh that Netflix had expressed interest in distributing *Legends*.

          i.     For example, on February 9, 2016, JOINER emailed Huh to tell him that "things have begun to pick up steam with Netflix as a potential distributor of the film. I have another meeting with them this week."

          ii.    On February 12, 2016, JOINER sent Huh a follow-up email telling him, "On Netflix, I had another good meeting with them yesterday and expect to receive a contract from them by the end of the week."

      c.     Before KIP representatives signed off on an agreement to invest in *Legends*, Huh pressed JOINER to provide a copy of the latter's distribution agreement with Netflix. On April 5, 2016, for instance, Huh emailed JOINER, instructing him, "Per our conversation, please ask . . . someone at Netflix to fax it again tomorrow and also send it to the gmail accounts below from Netflix domain email." The following day, Huh wrote again, saying, "In regards to validation on closing of the agreement between Netflix and [Dark Planet Pictures] on Legends[,] [p]lease make sure that we have it in both fax and email by our tomorrow morning."

      d.     On April 7, 2016, Paul Huh received a fax bearing a Netflix cover sheet. Included in the transmission was a letter, dated April 5, 2016, purporting to "confirm that an agreement between Netflix, Inc and Dark Planet Pictures, LLC was executed March 31st 2016." The letter was signed by an individual identified as "Vice President, Business & Legal Affairs/Content Acquisition" ("Executive 1"). That same day, JOINER also forwarded an email, purportedly from Executive 1, using an email address from a Netflix email domain, that attached a purported distribution agreement between Netflix and Dark Planet Pictures.

4

    e. Similarly, JOINER forwarded Huh an email chain on April 8, 2016, with the purported distribution agreement attached. The chain included a purported email from a Netflix Vice President ("Executive 2") stating, "Look forward to making this movie!"

    f. The distribution agreement, dated March 31, 2016, and attached to the April 7 and April 8 emails described above, was signed by JOINER on behalf of Dark Planet Pictures. On behalf of Netflix, the agreement was purportedly signed by the Chief Content Officer for Netflix ("Executive 3").

    i. I interviewed Executive 1 by telephone on August 5, 2019, at which time I reviewed with him both the fax and email chain he had purportedly signed. Executive 1 had worked at Viacom as Vice President of Business & Legal Affairs for Content Distribution, and while he had done some limited contract work with Netflix, he had never been directly employed by Netflix. Executive 1 confirmed that he did not know JOINER, that he had no knowledge of Dark Planet Pictures, that the signature from the fax was not his, and that he had neither sent nor received the email chain.

    ii. I interviewed Executive 2 in person on June 19, 2019. Executive 2 had, in fact, previously served as Vice President for Content at Netflix at the time of the purported distribution agreement. Executive 2 confirmed that he never met or communicated with JOINER or his brother, and that he had no knowledge of Netflix ever participating in talks to distribute a film called *Legends* or doing business with Dark Planet Pictures.

    iii. I interviewed Executive 3 in person on June 26, 2019, at which time I showed him a copy of the purported distribution agreement between Netflix and Dark Planet Pictures. Executive 3 confirmed that the signature was not his, that the document was not consistent with distribution agreements Netflix used, and that he rarely signed such documents during the time period of March 2016. Executive 3 did not recognize the name of JOINER, his brother, Dark Planet Pictures, or *Legends*, and had no record of Netflix doing business with any of them.

12. I have reviewed a formal investment agreement that KIGCF and Dark Planet entered into on April 9, 2016. As part of the terms, KIGCF agreed to invest at least $8 million by depositing it the *Legends* Bank Account. Paragraph 8(2)(e) of the agreement specifies that the "existence of the Distribution Agreement between [Dark Planet] and Netflix, Inc. is a material basis for [KIP's] decision to invest in the Motion Picture." JOINER signed the agreement on behalf of both Legends Film Co, LLC and Dark Planet Pictures, LLC.

13. Based on my review of records for the *Legends* Bank Account, I know that KIP caused KIGCF to wire $4 million—the first half of its investment—into the account on April 14, 2016.

### B. Chinese Investment Firm Invests Millions Based on JOINER's Misrepresentations

14. Based on my investigation to date and review of publicly available records, Star Century Pictures Co., Ltd. ("Star Century") is an investment firm based in the People's Republic of China. PGA Yungpark Capital Ltd ("Yungpark") is an affiliate of Star Century.

15. Based on my review of publicly available documents, I learned that, the month after receiving the first $4 million installment from KIGCF in April 2016, JOINER engaged in similar fraudulent conduct with Star Century:

a. On May 25, 2016, Star Century and Yungpark entered into an investment agreement, which I have also reviewed, with JOINER acting on behalf of Dark Planet and Legends Film Co. Paragraph 9(2)(e) of the investment agreement specifies that the "existence of the Distribution Agreement, under which [Netflix] is committed to acquire the distribution right to the Motion Picture . . . is a material basis for [Star Century's] decision to invest in the Motion Picture." Appended to the investment agreement as "Exhibit A" was the same fraudulent distribution agreement provided to KIP and purportedly signed by Executive 3. Yungpark wired $6 million into the *Legends* Bank Account a few days later on June 3, 2016.

### C. Defendant Continues to Lie After Initial Investments by KIGCF and Yungpark

16. From my review of emails provided by KIP, I know that, subsequent to these investments, JOINER continued to provide updates concerning the supposed status of *Legends* film production:

    a. For example, on June 29, 2016, JOINER informed Huh by email, "[W]e are expecting to secure Don Murphy by this Friday to be our 'name' Producer for the film. Don has done all of the Transformers movies and several others. He has discussed wanting to bring in Michael Bay to direct so we plan to explore that."

    b. In another email, dated October 1, 2016, JOINER wrote Paul Huh from KIP and Ma Xue from Star Century, "Director: We agreed to terms verbally yesterday with Guillermo del Toro and his agent."

        i. On August 9, 2019, I interviewed Don Murphy in person. He explained to me that he had, in fact, been retained by JOINER to produce his film (now called *Folkwar*) and verified that he had entered into a Producer Agreement with JOINER dated December 19, 2016, with Murphy to receive $1.2 million for his services. Murphy noted that, because JOINER did not have an established track record of successful film production, the agreement was crafted to involve the use of an escrow account and an initial payment of $600,000 upon execution of the agreement. That $600,000 payment was made.

        ii. Murphy stated that JOINER had not indicated that any film distributor was on board to distribute his movie. Indeed, one of the services Murphy would be expected to render as producer would be securing a distributor for the film. Though Murphy had taken steps toward the production of the film, such as contacting agents and film talent, no actor or director had committed to the film—including Guillermo del Toro. Eventually, JOINER notified him that he would be closing the escrow account, and to mitigate the risk of loss, Murphy had JOINER transfer him $200,000 from the escrow account.

7

            iii.    Murphy explained that the film never reached the preproduction stage, nor was any distributor ever secured. He stated that, around the summer of 2017, he had emailed JOINER to end their business relationship and has not heard from JOINER since.

        c.    JOINER eventually informed KIP representatives that he was attempting to bring on Amblin to replace Netflix as film distributor for *Legends*. On December 2, 2016, John Yi emailed KIP personnel a purported "memorandum of understanding" between Dark Planet Pictures and Amblin and dated December 1, 2016. The memorandum of understanding provided that Amblin would distribute *Legends*, and the document contained supposed signatures from JOINER and Amblin's CEO ("Executive 4").

            i.    I interviewed Executive 4 by telephone on May 29, 2019. Executive 4 is currently the President of Epix but was, in fact, CEO of Amblin from November 1, 2014, until September or October 2017. Executive 4 did not know JOINER, Dark Planet Pictures, or *Legends*, and verified that he had never entered into any contracts concerning them. Executive 4 also reviewed the memorandum of understanding and confirmed the signature it bore was not his.

        d.    JOINER also sent John Yi a "Termination Agreement" supposedly terminating the distribution agreement between Dark Planet Pictures and Netflix as of December 19, 2016. Yi forwarded the "Termination Agreement" to KIP personnel by email on December 21, 2016. This document bore a signature for Executive 2 as well as JOINER.

            i.    As mentioned above, I interviewed Executive 2. He explained to me that not only was this letter a forgery, but that the time frame made no sense: Executive 2's employment with Netflix ended on December 1, 2016, and he had physically left the office several weeks prior to that date.

    17.    Based on the representations concerning the new distribution agreement with Amblin, KIGCF entered a "first amendment" to its original investment agreement with Dark Planet Pictures. Paragraph 2.3(e) of the first amendment specifies, "The existence of the

Distribution Agreement between [Dark Planet] and Storyteller Distribution Co, LLC is a material basis for [KIP's] decision to invest in the Motion Picture."

18. From my review of bank records, I know that KIGCF wired an additional $4 million into the *Legends* Bank Account on January 11, 2017.

**D. The Fraud Revealed**

19. In the months after this wire transfer, JOINER provided excuses for delays in filming along with assurances that he could reimburse investors' money. Through my review of emails provided by KIP, I learned the following:

    a. On March 22, 2017, JOINER emailed Paul Huh with a status update and attached a bank statement for his *Legends* Bank Account. For the period of February 8, 2017, to March 7, 2017, it reported a balance of $11,799,670.55.

        i. In reviewing records for the *Legends* Bank Account, I have verified that the statement JOINER emailed on March 22, 2017, was a forgery. The true statement for that account—which actually spans February 1 to February 28—shows a balance of just $32,628.93 for the month.

    b. On March 31, JOINER emailed Huh to explain that filming was delayed because of "internal politics with Amblin/Universal"—"[o]nce Bradley Cooper turned down the agreement with Universal . . . Universal decided to refuse payment to Amblin."

    c. Eventually, KIP requested that its investment be refunded, and JOINER agreed in an April 10, 2017, email that the funds could be returned "immediately."

    d. JOINER and KIP entered into a second amendment to the investment agreement, which I reviewed, with JOINER agreeing to return the $8 million KIP had invested in *Legends*. The effective date of the agreement is May 8, 2017.

    e. JOINER, however, did not return the funds. KIP made efforts to investigate through John Yi, which resulted in JOINER emailing John Yi on July 13, 2017. In the email, JOINER stated, "I understand you attempted to contact Don Murphy and his office

this afternoon. Please cease and desist any attempts at contacting Mr. Murphy, whether in person or by phone, or it shall be deemed harassment."

    **E.**    **Financial Records**

20.    As set forth above, I have reviewed bank records for the *Legends* Bank Account and confirmed the following wire transfers:

    a.    April 14, 2016, deposit of $4 million from KIGCF (before this transfer, the balance on the account was the $100 deposited upon its being opened on January 4, 2016);

    b.    June 3, 2016, deposit of $6 million from Yungpark; and

    c.    January 11, 2017, deposit of $4 million from KIGCF.

I have confirmed with Bank of America that these transfers originated from outside the United States—South Korea, in the case of KIGCF and China, in the case of Yungpark.

21.    Other than the foregoing international wire transfers, the only deposits into the *Legends* Bank Account that I saw from January 2016 through March 2017 were a $10,000 transfer from an account in the name of Allison Joiner, whom I believe to be JOINER's wife based on my review of law enforcement databases; a document submitted to California Investors Escrow dated June 28, 2016, that was signed by JOINER and Allison Joiner in which they indicated that they were husband and wife; and records for their Bank of America joint checking account. The account also shows a $600,000 counter credit from August 12, 2016, that appears to represent a recalled check for the same amount that was listed as a customer withdrawal on July 26, 2016.

22.    In reviewing records for this account, I have also observed several withdrawals and debits that appear unrelated to the production of the film *Legends*. These include:

    a.    April 15, 2016, transfer of $800,000 to a joint account in the names of JOINER and Allison Joiner;

    b.    June 27, 2016, transfer of $160,500, to California Investor Escrow. My review of documents obtained from California Investor Escrow indicates that this was a security deposit for the purchase of the SUBJECT PREMISES;

      c.      August 12, 2016, transfer of $5,192,916.92 to California Investor Escrow. My review of documents obtained from California Investor Escrow indicates that this transfer was the balance of the amount owed for the purchase of the SUBJECT PREMISES;

      d.      September 21, 2016, transfer of $120,000 to a joint account in the names of JOINER and Allison Joiner;;

      e.      January 13, 2017, transfer of $4,300,000 to another bank account in the name of Stock Car Willie, LLC;[2]

      f.      January 30, 2017, transfer of $60,000 to another bank account in the name of Stock Car Willie, LLC;

      g.      June 2, 2017, transfer of $400,000 to a joint account in the names of JOINER and Allison Joiner; and

      h.      June 9, 2017, transfer of $25,000 to a joint account in the names of JOINER and Allison Joiner.

**F.**    **JOINER's Connection to the SUBJECT PREMISES**

23.    As described above, JOINER's bank and escrow records show that he purchased the SUBJECT PREMISES in August 2016. Los Angeles County Registrar records also indicated that the deed to the SUBJECT PREMISES had been filed in August 2016 under JOINER's name.

24.    On July 18, 2019, I conducted surveillance at the SUBJECT PREMISES after familiarizing myself with JOINER's appearance based on his California Department of Motor Vehicles photograph and physical descriptions I have previously received. During surveillance, I saw an individual walk onto a balcony of the SUBJECT PREMISES in the morning whom I recognized to be JOINER.

---

[2] From my review of Bank of America records for this account, I learned that it was opened on October 21, 2016, and that JOINER was listed as the sole signer. The film website IMDb also lists an entry for a film called *Stock Car Willie*, and provides the following synopsis: "An African-American driver turns the world of NASCAR upside down." https://www.imdb.com/title/tt5753852/plotsummary. *Stock Car Willie* is listed as in development.

25. On August 5, 2019, I reviewed records from a law enforcement database, which indicated that JOINER was still in control of the SUBJECT PREMISES. Based on my review of financial and property records and the surveillance I conducted, I believe JOINER still lives at the SUBJECT PREMISES.

### G. Training and Experience in Investigating Financial Offenses

26. Based on my training and experience, and information from other experienced investigators of fraud offenses, I know the following:

    a. Individuals involved in fraud schemes often use the proceeds of the fraud to purchase expensive items, or store the proceeds in the form of cash to make it more difficult to trace.

    b. Typically, individuals involved in fraud schemes maintain evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their residences and vehicles. Indeed, in this case, JOINER appears to have made substantial use of digital devices to communicate in furtherance of the scheme by email. I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded. Computers, tablets and cell phones can be used to communicate between co-conspirators and may contain information relating to the crime under investigation. And, even when those who use digital devices to commit fraud do upgrade them, they often transfer data across devices, such as contact lists, email and text communications, and documentary records.

    c. Individuals involved in fraud frequently keep the most damaging evidence and/or proceeds of the scheme at their residences and in their vehicles to help conceal the fraud from third parties, such as coworkers who may have access to such documents at the workplace. Proceeds such as cash and gifts are easier to conceal at the fraudster's residence rather than in plain view of coworkers.

    d. More sophisticated or cagey criminals may rent public storage units, safe deposit boxes, or other third-party space to further distance themselves from incriminating evidence or to hide their illicit profits from law enforcement or civil litigants. Such individuals typically maintain items relating to those third-party locations at their homes, such as keys, addresses, and leasing documents.

  27. The requested search warrant seeks not only to seize evidence of crimes but also the "fruits of crime" and "property designed for use, intended for use, or used in committing a crime." Fed. R. Crim. P. 41(c). Even long after a crime has been completed, the illicit proceeds of a crime often still exist, frequently secreted in forms or locations difficult to detect by law enforcement. For that reason, there is probable cause to seize evidence pertaining to JOINER's current assets, such as his ownership of the SUBJECT PREMISES, which was purchased using funds derived from his investment fraud scheme.

  **H.** **Summary of Criminal Charges**

  28. Based on the foregoing facts, I submit that there is probable cause to charge the following crimes:

    a. **Wire Fraud:** As described above, on April 7, 2016, JOINER knowingly and with intent to defraud caused an email to be sent to Paul Huh in South Korea that attached the forged distribution agreement with Netflix. In reality, JOINER had entered into no such agreement with Netflix to distribute *Legends*.

    b. **Engaging in Financial Transactions with Criminal Proceeds:** By transferring $5,192,916.32 from the *Legends* Bank Account to California Investor Escrow on August 12, 2016, to purchase the SUBJECT PREMISES, JOINER engaged in a monetary transaction affecting interstate commerce in criminally derived property of more than $10,000. At the time, only $10,100 in the *Legends* Bank Account was derived from sources other than KIGCF or Yungpark.

    c. **Aggravated Identity Theft:** JOINER knowingly used the name of Executive 3—whose initials are T.S.—in connection with the wire fraud described above by

representing, through the forged Netflix distribution agreement, that Executive 3 had signed the agreement.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

  c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

  d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  30. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

  e. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

  f. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    g. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    h. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    i. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress JOINER's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of JOINER's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

32. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

33. For all the reasons described above, there is probable cause to believe that ADAM JOINER has committed wire fraud, engaging in transactions with criminally involved property, and aggravated identity theft, in violation of a violation of 18 U.S.C. §§ 1343, 1957, and 1028A,

and that evidence, contraband, fruits, or instrumentalities of acts of wire fraud, money laundering, and aggravated identity theft, in violation of 18 U.S.C. §§ 1343, 1956, 1957, and 1028A, as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.

NATHAN CHERNEY, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this ____ day of August, 2019.


THE HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE