TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1259
    Facsimile: (213) 894-0141
    E-mail:   alexander.schwab@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>ADAM JOINER,<br><br>       Defendant. | No. CR 19-541-AB<br>No. CR 19-744-AB<br><br>GOVERNMENT'S SENTENCING POSITION<br>REGARDING DEFENDANT ADAM JOINER<br><br>Hearing Date: October 15, 2021<br>Hearing Time: 1:30 p.m.<br>Location:    Courtroom of the<br>                Honorable André<br>                Birotte Jr. |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Alexander B. Schwab, hereby files its sentencing position regarding defendant Adam Joiner ("defendant").  The government is also filing separately, and under seal, a victim impact statement as an exhibit to this sentencing position.

    This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case,

including the Presentence Investigation Report ("PSR"), and such
further evidence and argument as the Court may permit.

Dated: October 1, 2021              Respectfully submitted,

                                    TRACY L. WILKISON
                                    Acting United States Attorney

                                    SCOTT M. GARRINGER
                                    Assistant United States Attorney
                                    Chief, Criminal Division


                                         /s/
                                    _____
                                    ALEXANDER B. SCHWAB
                                    Assistant United States Attorney

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                           <u>PAGE</u>

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION....................................................1

II.   STATEMENT OF FACTS..............................................2

III.  SENTENCING GUIDELINES...........................................6

IV.   ARGUMENT........................................................8

     A.    The Nature of Defendant's Crimes and the Shamelessness
         of His Behavior Demonstrate a Particular Need for a
         Sentence Sufficient to Afford Adequate Deterrence........8

     B.    The Seriousness of Defendant's Crimes...................10

     C.    Defendant's Background Provides No Excuse for His
         Conduct.................................................11

V.    RESTITUTION....................................................13

VI.   CONCLUSION.....................................................13

i

**<u>TABLE OF AUTHORITIES</u>**

<u>DESCRIPTION</u>                                                      <u>PAGE</u>

**Federal Cases**

<u>United States v. Augare</u>,
  800 F.3d 1173 (9th Cir. 2015) .................................. 7

<u>United States v. Finck</u>,
  407 F.3d 908 (8th Cir. 2005) ................................... 7

<u>United States v. Horob</u>,
  735 F.3d 866 (9th Cir. 2013) ................................... 7

<u>United States v. Jennings</u>,
  711 F.3d 1144 (9th Cir. 2013) .................................. 7

<u>United States v. Martin</u>,
  455 F.3d 1227 (11th Cir. 2006) ................................. 8

<u>United States v. Tanke</u>,
  743 F.3d 1296 (9th Cir. 2014) .................................. 7

**Federal Statutes**

18 U.S.C. § 1343 ............................................... 4

18 U.S.C. § 3147 .............................................. 14

18 U.S.C. § 3553 ............................................... 8

**United States Sentencing Guidelines**

USSG § 2B1.1 ................................................ 6, 7

USSG § 3C1.1 .................................................. 6

USSG § 3C1.3 .................................................. 6

**Other Authorities**

S. Rep. No. 98-255 (1983)................................... 8, 9

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant gives new meaning to the industry term "development hell."  Using a fraudulent Netflix distribution agreement bearing the forged signatures of real executives, defendant convinced investment firms in Korea and China to give him $14 million to invest in a film that would depict folklore icons like Paul Bunyan and John Henry. Defendant's representations proved to be as fictitious as the legendary figures his film was supposed to depict.  While defendant spent millions on himself, including the purchase of a $5.2 million house in Manhattan Beach, he continued to dissemble, concocting tales of contract negotiations with director Guillermo del Toro and a new distribution agreement with Amblin Partners in an effort to lull his victims into complacency.  Defendant's scheme was eventually uncovered, and he was arrested.

What followed was an exhibition in chutzpah.  After signing his plea agreement, defendant sold the Manhattan Beach house he had purchased with the proceeds of his fraud.  Before doing so, he fraudulently removed the liens his victims had placed on the house by filing documents bearing the forged signatures of attorneys who represented the victims.  Caught again, defendant entered an additional guilty plea to wire fraud.

Defendant's brazen conduct calls for a sentence sufficient to make him, and others like him, think twice before following a similar path.  The government therefore recommends, for both cases, concurrent sentences of 108 months' imprisonment, which fall at the low end of defendant's guideline range; three years of supervised release; and two $100 special assessments.

## II.  STATEMENT OF FACTS

Defendant committed two sets of crimes.  First, he cheated two Asian investment firms out of $14 million, over $5 million of which he spent on purchasing a house in Manhattan Beach.  Second, after signing a plea agreement, defendant fraudulently removed liens placed by the victims on the home he bought.  These two sets of crimes gave rise to two separate guilty plea factual bases, both of which are recounted here.

At defendant's first change of plea, he agreed to the following factual basis:

> Beginning on an unknown date, and continuing through at least July 13, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant knowingly and with the intent to defraud devised and executed a scheme to defraud potential investors as to material matters, and to obtain money and property from the potential investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  Defendant would represent to potential investors that he was seeking financial backing for a film he was producing called Legends.  To convince the potential investors to back the film, defendant would falsely represent that major film distributors, including Netflix and Amblin/Storyteller, had agreed to distribute Legends and send them fabricated distribution agreements purporting to verify his false representations.  These false distribution agreements used the names and sometimes purported signatures of real persons associated with the film distributors.  In reality, as defendant knew, no such agreements had been made, his representations were false, and the distribution agreements were fraudulent and the signatures on them were forgeries.  In reliance on these fabricated distribution agreements, the potential investors would enter into investment agreements with defendant and transfer funds to a bank account under his control.

> In furtherance of the scheme, defendant sought funding from Korean Investment Partners Co., Ltd. ("KIP"), which managed the assets of Korea Investment Global Contents Fund ("KIGCF"), an investment fund based in South Korea.  On or about April 8, 2016, defendant forwarded an email chain -- thereby making use of an international wire communication -- to a KIP executive located in South Korea.  The email chain included a purported email from a Netflix Vice

2

President, whose initials are S.C., stating, "Look forward to making this movie!" This email was a forgery. The email chain also included, as an attachment, a purported distribution agreement between defendant's company Dark Planet Pictures -- and Netflix. The distribution agreement, which also was a forgery, included the name and a purported signature from an individual whose initials are T.S. and who was the Chief Content Officer for Netflix. At the time he sent them to KIP, defendant knew T.S. and S.C. to be real people, and knew the email chain and distribution agreements to be fabricated. Defendant submitted the same fraudulent distribution agreement with the purported signature of T.S. to Star Century Pictures Co., Ltd. ("Star Century"), which was a Chinese investment 13 firm, and PGA Yungpark Capital Ltd ("Yungpark"), which was an affiliate of Star Century. In reality, defendant had no distribution agreement with Netflix.

After sending the false distribution agreement to KIP and Star Century, defendant continued to provide false updates concerning the film which were designed to lull KIP and Star Century into believing his earlier false representations. For example, on October 1, 2016, defendant emailed representatives from both investment firms stating, "We agreed to terms verbally yesterday with Guillermo del Toro and his agent." Eventually, defendant informed KIP representatives that he was attempting to bring on Storyteller Distribution Co., LLC, doing business as Amblin Partners ("Amblin"), to replace Netflix to distribute Legends. On December 2, 2016, defendant caused a third party to email KIP personnel a purported "memorandum of understanding" between Dark Planet Pictures and Amblin that was dated December 1, 2016. The memorandum of understanding provided that Amblin would distribute Legends, and the document contained a supposed signature from M.W., a real individual who was Amblin's CEO. Again, defendant knew this purported agreement to be a forgery at the time he sent it to KIP as he, in fact, had no such agreement with Amblin.

Based on the fraudulent material representations defendant made, KIGCF and Yungpark agreed to invest in Legends and wired money into a Bank of America account ending -0230 in the name "Legends Film Co, LLC" that defendant controlled ("Legends Bank of America account"). These wirings included an April 14, 2016, deposit for $4 million from KIGCF; a June 3, 2016, deposit for $6 million from Yungpark; and another $4 million deposit from KIGCF on January 11, 2017. With the funds defendant received into his Legends Bank of America account from KIGCF and Yungpark, defendant caused the following financial transactions to occur:

- April 15, 2016, transfer of $800,000 to defendant's joint account with his wife (the "Joint Account");

3

- June 27, 2016, transfer of $160,500, to California Investor Escrow as a security deposit for the purchase of a house in Manhattan Beach;

- August 12, 2016, transfer of $5,192,916.92 to California Investor Escrow to pay for the balance of the amount owed for the purchase of the house in Manhattan Beach;

- September 21, 2016, transfer of $120,000 to the Joint Account;

- January 13, 2017, transfer of $4,300,000 to another bank account in the name of Stock Car Willie, LLC;

- January 30, 2017, transfer of $60,000 to another bank account in the name of Stock Car Willie, LLC;

- June 2, 2017, transfer of $400,000 to the Joint Account; and

- June 9, 2017, transfer of $25,000 to the Joint Account.

    In total, defendant's fraud scheme caused approximately $8 million in financial losses to KIGCF and another $6 million in losses to Yungpark for a total of approximately $14 million.

(CR 19-541-AB, Plea Agreement ¶ 11, at 7-11).

    In entering his second guilty plea, defendant agreed to the following additional factual basis:

    Beginning on an unknown date, and continuing through at least October 11, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant knowingly and with the intent to defraud devised and executed a scheme to defraud as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  On August 27, 2019, defendant was arrested in United States v. Joiner, No. CR 19-541-AB, and made his initial appearance, at which time he was released on a $350,000 appearance bond under Title 18, United States Code, Chapter 207.  Defendant later signed a plea agreement with the government in which he agreed, among other things, to plead guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, and not commit any other crimes.  That plea agreement was filed with the Court on September 16, 2019, and defendant entered his guilty plea to wire fraud on October 18, 2019.

4

As part of the conduct that gave rise to his guilty plea to wire fraud, defendant used approximately $5.2 million of the proceeds of wire fraud to purchase the real property located at 441 3rd Street, Manhattan Beach, California 90266 (the "Manhattan Beach House") knowing that the funds he used were the proceeds of wire fraud. The victims of the wire fraud to which defendant pleaded guilty -- Korean Investment Partners Co., Ltd. ("KIP"), which managed the assets of Korea Investment Global Contents Fund ("KIGCF"); and Star Century Pictures Co., Ltd. ("Star Century"), and its affiliate PGA Yungpark Capital Ltd ("Yungpark") -- secured liens on the Manhattan Beach House in connection with civil litigation against defendant, and Star Century and Yungpark had also secured a writ of execution against the Manhattan Beach House.

After defendant signed his plea agreement but before entering his guilty plea, defendant engaged in a scheme to fraudulently remove the liens on the Manhattan Beach House so he could sell it to a prospective home buyer. In furtherance of this scheme, defendant created purported legal filings, including a "release of writ of attachment," a "release of notice of pendency of action," and a "release of writ of execution." In conducting this scheme, defendant used the identities of individuals he knew to be real persons: the "release of writ of attachment" included the name and forged signature of victim E.J.C., a real attorney representing KIP; and the "release of notice of pendency of action" and "release of writ of execution" included the name and forged signature of victim R.M., a real attorney who formerly represented Star Century. In the course of selling the Manhattan Beach House to the prospective home buyer, defendant furnished these fraudulent "release" documents to Fidelity National Title Company. Defendant caused these fraudulent releases, along with a grant deed to the Manhattan Beach House transferring ownership from defendant to the prospective home buyer, to be recorded with the Official Records Recorder's Office, Los Angeles County, on October 10, 2019. Defendant conducted this transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, and control of the proceeds of the wire fraud offense to which he previously pleaded guilty.

As a result of the sale of the Manhattan Beach House, on October 11, 2019, defendant caused a wire transfer of $5,497,410.83 to be sent from a Peninsula Escrow, Inc. escrow account to a Morgan Stanley bank account ending in "2039" that was in the name of defendant and his wife. That wire transfer traveled in interstate commerce.

(CR 19-744-AB, Superseding Plea Agreement ¶ 13, at 10-12).

## III.  SENTENCING GUIDELINES

As part of his superseding plea agreement, defendant stipulated to the following sentencing guidelines:

| | | |
|---|---|---|
| Base Offense Level | 7 | USSG § 2B1.1(a)(1) |
| Loss > $9.5 million | +20 | USSG § 2B1.1(b)(1)(K) |
| Obstruction of Justice | +2 | USSG § 3C1.1 |
| Offense While on Release | +3 | USSG § 3C1.3 |

The PSR also applies a two-level adjustment under USSG § 2B1.1(b)(10) for defendant's use of "sophisticated means" in committing his offense specifically citing the fact that he "created three [fictitious] legal filings . . . used the names and forged the signatures of actual lawyers representing the victims . . . then provided these fraudulent release documents to Fidelity National Title Company, causing these releases, along with the grant deed, to be recorded in the county recorder[']s office."  (PSR ¶ 49, at 11-12).  As the factual basis to defendant's original plea agreement makes clear, this was not the first time defendant employed convincing forgeries to further his schemes, having persuaded KIP and Star Century to provide him $14 million based on a series of fabricated emails and fake distribution agreements.  To further lull his victims, defendant fabricated new distribution agreements purporting to show that Amblin, rather than Netflix, would be distributing his film.

The application notes to the Sentencing Guidelines offer, as examples of "sophisticated means," "locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction" or "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore

6

1  financial accounts." USSG § 2B1.1, comment. (n.9(B)). This list is
2  not exhaustive, and "the enhancement properly applies to conduct less
3  sophisticated than the list articulated in the application note."
4  United States v. Jennings, 711 F.3d 1144, 1147 (9th Cir. 2013).

5      In particular, courts have repeatedly cited the use of forged
6  documents as a basis for applying the sophisticated means
7  enhancement.  See United States v. Tanke, 743 F.3d 1296, 1307 (9th
8  Cir. 2014) ("Although Tanke did not use 'fictitious entities,
9  corporate shells, or offshore financial accounts,' as the Sentencing
10  Commission's commentary contemplates, he created at least six false
11  invoices and falsified carbon copies of checks in Azteca's check
12  register on at least 10 occasions to conceal the payments."); United
13  States v. Horob, 735 F.3d 866, 872 (9th Cir. 2013) (per curiam)
14  ("[The defendant] did more than lie to obtain a loan.  He manipulated
15  several people to lie for him, used several different bank accounts
16  (including accounts of other people) to move funds around, and
17  fabricated numerous documents.").  Even when a particular artifice
18  would not trigger the enhancement in isolation, "'[r]epetitive and
19  coordinated conduct, though no one step is particularly complicated,
20  can be a sophisticated scheme.'"  United States v. Augare, 800 F.3d
21  1173, 1175 (9th Cir. 2015) (quoting United States v. Finck, 407 F.3d
22  908, 915 (8th Cir. 2005)).

23      Including two levels for sophisticated means and adjusted for
24  defendant's acceptance of responsibility, defendant's total offense
25  level is 31, which yields a guideline range of 108 to 135 months'
26
27
28

7

1   imprisonment.  The government's recommendation of 108 months'
2   imprisonment falls at the low end of that range.[1]

3   **IV.  ARGUMENT**

4       While all the statutory sentencing factors support a significant
5   sentence in this case, such a sentence is most strongly supported
6   here by the need for adequate general and specific deterrence and the
7   seriousness of defendant's crimes.  See 18 U.S.C. § 3553(a)(2)(A),
8   (B).

9       **A.   The Nature of Defendant's Crimes and the Shamelessness of**
10          **His Behavior Demonstrate a Particular Need for a Sentence**
            **Sufficient to Afford Adequate Deterrence**

11      Defendant's scheme, which generated $14 million in proceeds,
12  requires a serious sentence to deter others who might believe such a
13  staggering sum of money would be worth the chance of being caught.
14  Economic crimes like defendant's are quintessentially deterrable so
15  long as they are met with significant term of imprisonment.  "Because
16  economic and fraud-based crimes are 'more rational, cool, and
17  calculated than sudden crimes of passion or opportunity,' these
18  crimes are 'prime candidate[s] for general deterrence.'"  United
19  States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting
20  Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After
21  Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)).  In fact, Congress,
22  in drafting § 3553, confirmed that this common-sense principle was
23  one of the driving forces for including deterrence among the goals of
24  sentencing.  See S. Rep. No. 98-255, at 76 (1983), reprinted in 1984
25  U.S.C.C.A.N. 3182, 3259 ("To deter others from committing the offense

26

27      [1] Without inclusion of the additional two levels for use of
    sophisticated means, defendant's guideline range would be 87 to 108
28  months' imprisonment, and the government's recommendation would fall
    at the high end of that range.

. . . is particularly important in the area of white collar crime."). Indeed, Congress was expressly concerned with the fact that "[m]ajor white collar criminals often are sentenced to . . . little or no imprisonment," which the offenders disregard as "a cost of doing business." Id.

Defendant's conduct demonstrates more than just the need for general deterrence applicable to all large-scale fraud schemes; rather, the crimes he committed after his arrest in his original case reveal a particular need for specific deterrence as well. Under defendant's original plea agreement, he faced an anticipated guideline range of 51 to 63 months' imprisonment based on the loss amount and acceptance of responsibility. But apparently the prospect of a sentence within this range was insufficient to dissuade him from persisting in criminal activity. The behavior also demonstrates that defendant's investment fraud scam was not an aberration, meaning that there is little assurance defendant will not reoffend without a significant sentence in place.

Defendant's mentality is further confirmed by emails he sent his neighbors in which he continued to lie and obfuscate even after his arrest. On August 28, 2019, after some news outlets covered defendant's arrest, defendant wrote, "I have been released, any and all charges against me will be dropped, and I will be testifying against my former partner for each of the charges referenced above in the article. Those charges are against him. Not me." (PSR ¶ 40, at 10). Even after he entered his (first) guilty plea, defendant persisted in his lies, writing, "I did enter a plea agreement on Friday. A conditional plea agreement where all charges against me are dropped in exchange for providing any and all testimony as

9

required against my former partner.  There is no guilt and there is no guilty plea." (PSR ¶ 41, at 10).  A 108-month sentence, at the low end of defendant's guideline range, is therefore necessary to afford adequate direct deterrence in this case.

Finally, while defendant's criminal history is relatively minor, it does include a 2011 misdemeanor conviction for falsifying business records -- in this case, to support "expense account reimbursements to which he was not entitled to between August 2010 and December 2010." (PSR ¶ 64, at 13).  The PSR explains that defendant "did this on eight occasions and fraudulently received $6,673.31." (Id.). While the proceeds of defendant's past crime were several orders of magnitude smaller than those in his current offense, this prior conviction does reveal a disturbing trend of an individual who graduated from a small-time con to a major investment scam.  This prior conviction may not be a basis for further increasing defendant's sentence, but it should serve as caution against the imposition of a sentence below defendant's guideline range.

**B.   The Seriousness of Defendant's Crimes**

Defendant's crimes speak for themselves: he spent years orchestrating an elaborate scheme to defraud foreign investment companies out of $14 million; he used over $5 million in criminal proceeds to buy himself a house in Manhattan Beach; and even after he was caught, he sought to subvert the judicial process by fraudulently attempting to sell that house out from under the investors by impersonating real lawyers who represented the victims.  Both the audacity and the consistency of these offenses speak to their seriousness.

In addition to causing losses of $14 million to his victims, crimes like defendant's have ripple effects that undermine legitimate investments.  KIP, which serves as the general partner managing KIGCF, a Korean government fund, has noted in its victim impact statement that "the loss of investment funds has triggered an abundance of negative feedback that will impact future government funding."  (Exh. A, at 6).  Likewise, for legitimate film producers looking for funding, defendant's crimes may prove an obstacle to securing investments, either by scaring off potential investors worried about falling prey to a fraud or increasing the costs of borrowing.

To defendant's credit, since his second guilty plea, he and his counsel have been cooperative in KIP's efforts to recover funds defendant fraudulently obtained.  Per his superseding plea agreement, he stipulated to forfeiture of the proceeds of the sale of the Manhattan Beach house, permitting KIGCF to recoup over $4 million before sentencing.  And it is the government's understanding that defendant has willingly shared information with KIP's counsel to assist in tracing how he spent the $8 million KIP invested, though it does not appear that this information has proved fruitful to KIP. While defendant's actions generally fall within the scope of his plea agreement and restitution obligations, they do demonstrate a meaningful effort to make his victim whole, though not an extraordinary one.  For these reasons, a sentence at the low end of defendant's guideline range suffices.

**C.  Defendant's Background Provides No Excuse for His Conduct**

Notwithstanding defendant's claim that his childhood was "hard" because of the lack of emotional support he received from his father

11

1    (PSR ¶ 74, at 14), defendant benefited from a stable, supportive

2    upbringing.  Defendant grew up in a two-parent household, had

3    academic and athletic success, was not socially isolated during his

4    childhood, and graduated from UCLA.  (PSR ¶¶ 73, 76, 95 at 14-15,

5    17).  That is not to say that defendant's upbringing was idyllic in

6    its entirety.  Almost no one's is.  But defendant's circumstances are

7    a far cry from the crippling poverty and unstable home life that

8    afflicted many of the criminal defendants in this district.

9        In mitigation, defendant also submits a psychological report

10   that identifies his "collection of serious anxieties and

11   insecurities" and alcohol abuse, while simultaneously acknowledging

12   that defendant is "clearly intelligent" and "clearly able to

13   understand the nature of his actions and the wrongfulness of his

14   actions."  (Romanoff Report 32).  Without diagnosing any specific

15   psychological ailment, the report concludes that defendant's

16   symptoms, "taken together[,] represent actual serious mental illness"

17   because "[o]ne of the essential hallmarks of all mental illness . . .

18   centers on the degree to which that illness impairs one's functioning

19   in the real world."  (Id.).

20       This analysis begs the question.  Rather than looking to

21   defendant's psychological conditions and determining whether they

22   induced his criminal behavior, the report does the opposite: it takes

23   the fact of defendant's crimes as itself proof that he must suffer

24   from "serious mental illness."  At a trivial level, it is undoubtedly

25   true that serious criminals engage in decisions and behaviors

26   different from the law-abiding, but it is unclear what import this

27   insight has for defendant's case.  It makes him no less morally

28   culpable for his conduct; as defendant's own psychiatric report

                                    12

notes, he is both "clearly intelligent" and "clearly able to understand the nature of his actions and the wrongfulness of his actions." (Romanoff Report 32). Neither does attributing the harm defendant inflicted to mental illness do anything to make his victims whole. Nor does it mitigate the need for a sentence sufficient to deter both defendant and others contemplating similar fraudulent conduct. If anything, a defendant who lacks self-control requires a greater sentence than the average person to discourage him from reoffending.

## V.   RESTITUTION

As set forth in defendant's superseding plea agreement, defendant caused $8 million in losses to KIGCF and $6 million in losses to Yungpark Capital. The total amount of restitution is therefore $14 million.

Through the forfeiture process, KIGCF has already received $4,075,171.07 in funds that were seized from the sale of defendant's house in Manhattan Beach, and that figure should be credited toward defendant's restitution obligation. An additional amount of $1,497,410.83 was also forfeited, and KIGCF is currently engaged in the Department of Justice's remission process to have those funds disbursed as restitution. Assuming that occurs, those funds should be credited against defendant's restitution obligation to KIGCF as well, but only once the funds have been successfully remitted.

## VI.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose a sentence of two concurrent terms of 108

months' imprisonment[2] and three years of supervised release, along with two $100 special assessments and an order of $14 million in restitution with credit for the restitution payments KIGCF already received.

---

[2] Because, by statute, defendant's enhanced sentence under 18 U.S.C. § 3147 must run consecutive to the rest of his sentence, the government joins the Probation Office in recommending that this be accomplished in case number 19-744-AB through a sentence of 90 months' imprisonment on count one followed by an 18-month sentence under § 3147.

14